JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ATLANTIQUE PRODUCTIONS, S.A., | ) Case No. CV 12-8632 DMG (PLAx) |
| Plaintiff, | ) |
| v. | ) **ORDER RE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. ## 83, 92]** |
| ION MEDIA NETWORKS, INC., | ) |
| Defendant. | ) |
| | ) |

This matter is before the Court on the parties' cross-motions for summary judgment.   The Court held a hearing on these motions on January 31, 2014.

Having duly considered the parties' written submissions and oral argument, the Court now renders its decision.   For the reasons set forth below, Atlantique's motion is **DENIED** and Ion's motion is **GRANTED**.

# I.

## FACTUAL BACKGROUND

**A.**   <u>**Evidentiary Objections**</u>

The parties each raise voluminous evidentiary objections to declarations and exhibits filed by the other.  [Doc. ## 115, 124, 127, 131.]  The majority of the objections pertain to evidence that the Court need not consider in order to decide the instant motions, and the Court declines to rule on such objections.  With respect to the remaining objections, the Court addresses the objections as necessary in the fact and discussion sections, *infra.*

**B.**   <u>**Undisputed and Disputed Facts**</u>[1]

The Court first addresses Ion's motion for summary judgment.  As it must on a motion for summary judgment, the Court sets forth the material facts, some of which are disputed, and views all reasonable inferences to be drawn from them in the light most favorable to Atlantique, the non-moving party.

Atlantique is a French corporation and a producer of international television drama series.  (Defendant's Statement of Genuine Issues ("D's SGI") ¶ 1 [Doc. # 110].)  Ion owns and operates ION Television, a nationally distributed television network that broadcasts cable in the United States.  (*Id.* ¶ 2.)  In 2012, Atlantique produced a television series ("the Series") that was scripted in English.  (*Id.* ¶ 3.)  Between April and July 2012, the parties negotiated the terms of an agreement under which Ion would acquire the U.S. rights to the Series.  (*Id.* ¶ 4.)  Specifically, their negotiations involved a "term sheet," and they exchanged numerous drafts of this agreement.  (*Id.* ¶ 8.)  At the heart of this dispute is whether the parties' term sheet—which was never signed by Ion—is binding.

Atlantique's agent at United Talent Agency, James Kearney, was primarily responsible for the contract negotiations for Atlantique.  (*Id.* ¶ 5.)  Other individuals

---

[1] Unless otherwise indicated, the facts recited in this section are undisputed.

1   involved included Atlantique's two General Managers, Klaus Zimmerman and Olivier
2   Bibas.   (Bibas Decl. ¶¶ 1, 4 [Doc. # 87].)

3          Marc Zand, Ion's Executive Vice President of Content Acquisitions and Business
4   Affairs, led the business negotiations for Ion.   (Zand Decl. ¶¶ 1, 5 [Doc. # 112].)
5   Brandon Burgess, Ion's CEO, was also involved in the negotiations.  (*Id.* ¶ 5.)  Ned Nalle
6   and Laverne McKinnon were two independent consultants hired by Ion to consult and
7   advise on creative matters.  (*Id.* ¶ 8.)[2]

8          On May 24, 2012, Zand sent Kearney an email with a proposed term sheet, the
9   final paragraph of which read:  "Non-binding expression of interest subject to binding
10  documentation and relevant approvals."   (Plaintiff's Statement of Genuine Disputes
11  ("Pl.'s SGD") ¶ 37 [Doc. # 105]; Zand Decl., Exh. 4 [Doc. # 95-1 at 11].)   Later drafts of
12  the term sheet omitted the final paragraph and included the words "ACCEPTED AND
13  AGREED," followed by signature blocks for Atlantique and Ion.  (Pl.'s SGD ¶¶ 38, 44;
14  *see, e.g.*, Zand Decl., Exh. 30 [Doc. # 95-1 at 126].)   When Zand sent drafts of the term
15  sheet by email, he indicated in the email that the term sheet "remains subject to final or to
16  various corporate approval."  (Zand Decl., Exh. 108 (Kearney Depo. at 174:1-13 [Doc. #
17  96-1 at 269]); Pl.'s SGD ¶ 18.)

18         The parties exchanged a series of emails on July 19, 2012 and July 20, 2012,[3]
19  which the Court outlines in detail below.

20         On July 19, 2012 at 7:42 A.M., Zand sent Kearney an email that read, in relevant
21  part:

22

23         _____
24         [2] Atlantique objects to the portion of Zand's declaration that identifies Nalle and McKinnon on
        the ground that it lacks foundation and/or personal knowledge.  [Doc. # 124.]  Zand explains the basis
25      for his personal knowledge in paragraph 9, to which Atlantique does not object:  "While I did not play a
        primary role for ION on creative matters, I was in frequent contact with Burgess and the creative
26      consultants throughout the negotiations."  (Zand Decl. ¶ 9 [Doc. # 112].)  Accordingly, Atlantique's
        objection to the cited portion of the declaration is **OVERRULED**.
27
        [3] The Court refers to the time stamps on the emails, which appear to be in Pacific Daylight Time,
28      unless otherwise noted.

-3-

1  Attached please find the final revised redline . . . together with clean
2  execution copy of the Term Sheet.  I've attempted to accommodate as many
3  of Atlantique's comments as possible, but this will remain our final draft.  *If*
4  *you/Atlantique find the attached acceptable, kindly sign (and pdf) a partially*
5  *executed Term Sheet with all the referenced exhibits.  Thereafter, we can*
6  *counter-sign and indicate requisite approvals per the attached exhibits and*
7  *other items you will reference.*
8  *Of course, final execution of the attached Term Sheet which [sic] remains*
9  *subject to various corporate approvals.*
10 (Zand Decl., Exh. 15 (emphasis added) [Doc. # 95-1 at 51]; Pl.'s SGD ¶¶ 41, 82-83.)   On
11 the evening of July 19, 2012, Zand and Bibas spoke on the phone.  (Pl.'s SGD ¶ 84.)
12         On July 19, 2012 at 6:55 P.M., Zand sent Bibas and Zimmerman an email that
13 read, in relevant part:
14         Based on our conversation this evening, attached is updated redline together
15         with final clean execution copy.
16 (Zand Decl., Exhs. 24, 25 [Doc. # 95-1 at 67, 73].)
17         On July 20, 2012 at 8:39 A.M., Zand sent Kearney an email stating:
18         Olivier [Bibas]/Klaus [Zimmerman] called my cell late last nite [sic] and
19         attached represented where we ended up.
20         I believe we are all good.  *Let me know how you want to move this along to*
21         *signatures.*  I've [sic] reviewing Rachel's approval letter and all seems in
22         line, . . . thx,"
23 (Zand Decl., Exh. 27 (emphasis added) [Doc. # 95-1 at 104].)  On July 20, 2012 at 10:39
24 A.M., Zand sent Bibas and Zimmerman an email that read, in relevant part:
25         Final execution copy of Term Sheet attached.  Also, draft copy of ION
26         approval letter.
27 (Zand Decl., Exhs. 24, 25 [Doc. # 95-1 at 67, 73]; Pl.'s SGD ¶¶ 85, 86.)  The draft "ION
28 approval letter" is an unsigned letter addressed to Bibas, with a signature block for Ion, in

1  which Ion "confirm[ed] that [it] ha[d] approved" the Series budget and production and
2  delivery schedule for the first production season and "confirm[ed] that [it] ha[d] been
3  meaningfully consulted" with respect to various creative elements of the Series.  (Zand
4  Decl., Exh. 25 [Doc. # 95-1 at 83].)  The letter was to include three exhibits:  (1) "Series
5  Budget"; (2) "Production and Delivery Schedule"; and (3) "Series Principal Lead Cast
6  and Guest Talents."  (*Id.*)

7         On July 20, 2012 at 11:11 A.M., Zand sent an email to Bibas, Zimmerman, and
8  others, stating:  "Resending Approval Letter, . . .  My assistant inadvertently included
9  some extraneous language from another letter, (apologies)."  (Zand Decl., Exh. 25 [Doc.
10 # 95-1 at 73].)

11        Zand subsequently sent Bibas and Zimmerman an email on July 20, 2012[4]
12 stating:

13        Olivier, . . . these are the most recent budget and production schedule [sic]
14        provided by UTA, . . . that I would assume we will attach as exhibits
15 (Zand Decl., Exh. 24 [Doc. # 95-1 at 67].)

16        On July 20, 2012 at 1:25 P.M., Bibas sent an email to Zand stating, in relevant
17 part:

18        Please find attached final version of the letter with appendixes.  Please
19        confirm you are ok.  Do you also wish to add the appendixes to the term
20        sheet?
21 (Zand Decl., Exh. 28 [Doc. # 95-1 at 116].)

22        Zand responded to Bibas with the following, in relevant part:

23        Does this conform to the draft letter I sent you?, . . . with the attachments of
24        budget and production & delivery schedule?
25        If so, . . . I'd suggest the process as follows:

26
27
28        ───────────────
       [4] The time stamp appears to be in Central Europe Time.  (*See* Zand Decl., Exh. 24.)

-5-

1.  Atlantique send ION partially executed Term Sheet with all referenced exhibits and final budget and production & delivery schedule

2.  ION return fully executed Term Sheet together with ION approval letter with referenced exhibits.

I hope this process makes sense and we can move on with a great production towards our mutual success

(Supp. Bibas Decl., Exh. NN [Doc. # 107-1 at 2].)

Zand then[5] sent an email to Bibas stating that "[t]he final version of [sic] letter looks fine," making two changes to the letter, and concluding with the words "[w]e good?"  (Zand Decl., Exh. 28 [Doc. # 95-1 at 115].)

Bibas sent an email to Zand on July 20, 2012, stating, in relevant part:

This is to confirm that we agree with the last version of the term sheet (attached – no change) + final version of the letter + 4 exhibits.

So we're closed !

I have left the office, so I would prefer that ION sends me partially executed copies of both the letter and the term sheet and I'll countersign on Monday morning if Ok for you.

Looking forward to our partnership and to making a great show !

(Zand Decl., Exh. 28 [Doc. # 95-1 at 115]; Pl.'s SGD ¶ 89.)

Zand responded to Bibas, in relevant part, as follows:

Its [sic] fine to wait until Monday and follow the protocol outline I had sent earlier, . . . (Atlantique send ION partially executed Term Sheet with all referenced exhibits and thereafter ION return fully executed Term Sheet together with ION approval letter with referenced exhibits.)

This should work, . . . and we also look forward to a great collaborative success.

---

[5] The order of the emails is not entirely clear as some of the time stamps appear to be in Central Europe Time and others appear to be in Pacific Standard Time.  (*See* Zand Decl., Exh. 28.)

(Zand Decl., Exh. 28 [Doc. # 95-1 at 115]; Pl.'s SGD ¶ 90.)

On July 23, 2012, Bibas sent the term sheet with his signature and the exhibits to Zand by email with the following message, in relevant part:

Please find hereattached [sic] the partially executed term sheet.

(Zand Decl., Exh. 30 [Doc. # 95-1 at 121]; Pl.'s SGD ¶ 92.)  Ion never countersigned and never returned the term sheet to Atlantique.  (Pl.'s SGD ¶ 93.)

## II.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  Partial summary judgment may be sought on any claim or defense, or part thereof, and the court may grant less than all of the relief requested by the motion.  *See* Fed. R. Civ. P. 56(a), (g).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324, quoting Fed. R. Civ. P. 56(c), (e) (1986); *see also Norse v. City Of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").  "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.

### DISCUSSION

**A.    Choice of Law**

Ion contends that the Court should apply New York law in adjudicating Atlantique's claims because the term sheet included a clause providing that "NY law and jurisdiction shall apply." (*See* February 28, 2013 Order at 4 [Doc. # 25].)   The Court refers to its February 28, 2013 Order, in which it denied Ion's motion to dismiss for improper venue or, in the alternative, to transfer venue, on the ground that "[t]he merits of this case pertain to contract formation, specifically, whether the Term Sheet is a valid contract" and "for the Court to conclude that a forum selection clause in the contract is valid, it must conclude that the parties agreed to that contract in the first instance.  This would be tantamount to a disposition of the entire dispute on the merits, but Defendant does not seek in its motion a ruling on the merits of the action." (February 28, 2013 Order at 5.)  Here, Ion *does* seek a ruling on the merits of the action, and, for the reasons discussed, *infra*, the Court determines that the parties do not have a valid, binding contract.  Thus, the term sheet's forum selection clause does not bind the parties.

Ion also argues that California's choice of law rules require a conclusion that New York law applies to the instant dispute.  (*See* Mot. at 15-17.)  In its October 10, 2013 Order [Doc. # 52], the Court reviewed the California choice of law rules and determined that Ion had not met its burden to demonstrate that foreign law, rather than California law, applies to the instant case.  Here, again, Ion has not met its burden.  With respect to the first step in the governmental interest analysis, Ion has not demonstrated that New York law "materially differs from the law of California." *Washington Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 919, 103 Cal. Rptr. 2d 320 (2001).  Indeed, Ion contends that the law of New York and California "would . . . require a similar finding." (Mot. at 16.) Accordingly, the Court applies California law.

1    **B.      Atlantique's Breach of Contract Claim**

2          Atlantique's first cause of action for breach of contract alleges that the parties

3    entered into the agreement on or about July 20, 2012.  (FAC ¶¶ 21-24.)

4          Under California law, the elements of a breach of contract claim are:   (1) a

5    contract;  (2)  the  plaintiff's  performance  or  excuse  for  nonperformance;  (3)  the

6    defendant's breach; and (4) the resulting damages to plaintiff.  *Reichert v. Gen. Ins. Co.*

7    *of America*, 68 Cal. 2d 822, 830, 69 Cal. Rptr. 321 (1968).  "Creation of a valid contract

8    requires mutual assent."  *First Nat. Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058,

9    1065 (9th Cir. 2011), citing *Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 59, 248 Cal.

10   Rptr. 217 (1988).

11         Atlantique  contends  that  the  parties  manifested  their  intent  to  be  bound  by  the

12   "final execution copy" of the term sheet on July 20, 2012, and, thus, they had a contract

13   as of that date.  (Pl.'s Opp'n at 15-16.)  Ion responds that there was no contract between

14   the parties.  (D's Reply at 4-16.)

15         A contract need not be formalized in a signed writing to be valid.   *Mitchell v.*

16   *Exhibition Foods, Inc.*, 184 Cal. App. 3d 1033, 1048, 229 Cal. Rptr. 535 (1986).  Rather,

17   oral or written negotiations of the parties "ordinarily result in a binding contract when all

18   of the terms are definitely understood, even though the parties intend that a formal

19   writing embodying these terms shall be executed later."  *Pac. Grove-Asilomar Operating*

20   *Corp. v. Cnty. of Monterey*, 43 Cal. App. 3d 675, 686, 117 Cal. Rptr. 874 (1974), quoting

21   (1 Witkin, Summary of Cal. Law (8th ed.) Contracts § 102, pp. 103-04); *see also Rennick*

22   *v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 313-14 (9th Cir. 1996), citing Restatement

23   (Second) of Contracts § 27 (1981); *Columbia Pictures Corp. v. De Toth*, 87 Cal. App. 2d

24   620 (1948) ("A manifestation of assent sufficient to conclude a contract is not prevented

25   from doing so because the parties manifest an intention to memorialize their already

26   made agreement in writing.").   Here, it is undisputed that the parties had negotiated the

27   terms of their agreement for months.  Neither party argues that the "final execution copy"

28

1   of the term sheet was missing any essential terms, or that the parties disagreed about its

2   terms.

3        This is not, however, the end of the inquiry.   "[W]hen it is a part of the

4   understanding between the parties in negotiating the terms of their contact that the same

5   be reduced to writing and signed by the parties, the assent to its terms must be evidenced

6   in the manner agreed upon or it does not become a binding or completed contract."   *Nolte*

7   *v. So. Cal. Home Bldg. Co.*, 28 Cal. App. 2d 532, 534, 82 P. 2d 946 (1938) (citation

8   omitted); *see also First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1065

9   (9th Cir. 2011), quoting *Smissaert v. Chiodo*, 163 Cal. App. 2d 827, 830-31, 330 P.2d 98

10   (1958) ("[W]here . . . there is a manifest intention that the formal agreement is not to be

11   complete until reduced to a formal writing to be executed, there is no binding contract

12   until this is done." (alteration in original).)   Whether the parties intended their agreement

13   to be effective immediately or to become binding only when the agreement is executed

14   depends on the circumstances.   *See First Nat'l*, 631 F.3d at 1065-66.   "The mutual

15   intention to which the courts give effect is determined by objective manifestations of the

16   parties' intent, including the words used in the agreement, as well as extrinsic evidence of

17   such objective matters as the surrounding circumstances under which the parties

18   negotiated or entered into the contract; the object, nature and subject matter of the

19   contract; and the subsequent conduct of the parties."   *Morey v. Vannucci*, 64 Cal. App.

20   4th 904, 912, 75 Cal. Rptr. 2d 573 (1998).

21        Here, the uncontroverted facts demonstrate that the understanding between the

22   parties in negotiating the agreement was that the term sheet had to be signed by both

23   parties in order to be valid.   On July 19, 2012, Zand told Kearney in an email that the

24   parties' agreement would become binding upon Atlantique signing and returning the term

25   sheet with all exhibits *and* Ion "counter-sign[ing]" and "indicat[ing] requisite approvals."

26   (Zand Decl., Exh. 15.)   In the same email, Zand told Kearney that "[o]f course, final

27   execution of the attached Term Sheet which [sic] remains subject to various corporate

28   approvals."   (*Id.*)   Zand proposed the same protocol to Bibas directly in another email.

1 (Supp. Bibas Decl., Exh. NN [Doc. # 107-1].)  Zand consistently referred to the "final"

2 copies of the term sheet as final "*execution* cop[ies]."  (Zand Decl., Exh. 15, 24, 25

3 (emphasis added).)

4        One day later on July 20, 2012, Zand told Kearney "I believe we are all good.  Let

5 me know how you want to move this along to signatures."  (Zand Decl., Exh. 27.)  Hours

6 later, after discussing Ion's approval letter and associated exhibits, Bibas confirmed by

7 email that Atlantique agreed with the term sheet, Ion's approval letter, and the exhibits.

8 (Zand Decl., Exh. 28.)  Recognizing that Zand had already specified a signing protocol,

9 Bibas told Zand that he "prefer[ed]" if Ion signed the term sheet and letter first, and Bibas

10 "countersign[ed]" second.  (*Id.*)  Zand did not agree to this change in the protocol, and

11 rather suggested that the parties "follow the protocol [Zand] had sent earlier,"

12 specifically, that Atlantique first send the "partially executed" term sheet with exhibits,

13 and then Ion "return [the] fully executed" agreement with Ion's approval letter and

14 exhibits.  (*Id.*)  Demonstrating his agreement with Ion's signature protocol, Bibas sent

15 Zand a "partially executed" term sheet days later.  (Zand Decl., Exh. 30.)

16        Atlantique's attempt to persuade the Court that the above-quoted communications

17 of the parties do not represent their mutual understanding is unavailing.

18        First, Atlantique conclusorily asserts—without citing any legal authority or factual

19 support—that " '[f]inal execution copy' means 'ready to close' to any reasonable

20 person."  (Pl.'s Opp'n at 15.)

21        Second, Atlantique contends that Zand's failure to explicitly "reserve ION's rights

22 or mention the need for any further corporate approvals" in the emails to which he

23 attached the "final execution copy" raises a triable issue of material fact that Zand was

24 "making an unconditional offer" and that Zand had already obtained any necessary

25 corporate approvals.  (Pl.'s Opp'n at 15.)  Atlantique's argument is unpersuasive.  Zand

26 sent an email to Kearney on July 19, 2012—*one day* before Atlantique alleges that the

27 parties closed the deal—outlining the signature protocol and noting that "final execution

28 of the . . . Term Sheet . . . remain[ed] subject to various corporate approvals."  Atlantique

1   has identified no legal authority to suggest that Zand was required to repeat these

2   statements in each subsequent email in order to preserve the parties' meeting of the

3   minds.  Nor has Atlantique identified any facts sufficient to raise a reasonable inference

4   that the parties' mutual understanding regarding the requirements for the agreement to

5   become binding changed.

6      Third, Atlantique's contention that the term sheet did not *itself* contain a provision

7   specifically requiring the parties' signatures (Pl.'s Opp'n at 15-16), is irrelevant given

8   that the parties' communications demonstrate their agreement as to the protocol to be

9   followed for the term sheet to be binding.  To the extent Atlantique appears to suggest

10  that the Ninth Circuit's decision in *First National Mortgage* supports its position, it is

11  mistaken.  At issue in *First National Mortgage* was whether an initial *signed* agreement

12  bound two parties where the parties had anticipated entering a subsequent formal

13  agreement, but ultimately were unable to do so.  631 F.3d at 1063.  The parties signed a

14  document entitled "Final Proposal," the last clause of which provided:  "The above terms

15  are hereby accepted by the parties subject only to approval of the terms and conditions of

16  a formal agreement."  *Id.*  The Ninth Circuit held that the district court had properly

17  denied summary judgment because the language of the signed "Final Proposal"

18  specifically stated that the agreement was binding and omitted a standard non-binding

19  clause that had been present in earlier drafts.  *Id.* at 1065.  *First National Mortgage* is

20  inapposite here, as the question is not whether a *signed* version of the term sheet is

21  binding absent a subsequent final agreement, but rather whether the parties had a mutual

22  understanding that the term sheet *had to be signed* by both parties in order to be binding.

23     Fourth, Atlantique argues that Zand's July 20, 2012 statement "I believe we are all

24  good" to Kearney "[a]dd[ed] certainty to Atlantique's belief that the deal was closed."

25  (Pl.'s Opp'n at 16.)  As an initial matter, Atlantique's *subjective* belief is irrelevant to the

26  question of whether there is a binding contract between the parties.[6] *See Stewart v.*

27  ───────────────────

28     [6] Ion objects to statements made in the supplemental declarations of Bibas and Kearney regarding their personal beliefs about the parties' agreement on the grounds that such statements lack

-12-

1  *Preston Pipeline, Inc.* 134 Cal. App. 4th 1565, 1587, 36 Cal. Rptr. 3d 901 (2005)

2  ("Mutual assent to contract is based upon objective and outward manifestations of the

3  parties; a party's subjective intent, or subjective consent, therefore is irrelevant."

4  (internal quotations omitted)).  In its entirety, Zand's statement reads:

5      Olivier [Bibas]/Klaus [Zimmerman] called my cell late last nite [sic] and

6      attached represented where we ended up.

7      I believe we are all good.  *Let me know how you want to move this along to*

8      *signatures.*  I've [sic] reviewing Rachel's approval letter and all seems in

9      line, . . . thx,"

10  (Zand Decl., Exh. 27 (emphasis added).)  Atlantique has identified no evidence sufficient

11  to raise a reasonable inference that the parties' mutual understanding changed.

12      Fifth, Atlantique argues that Zand made a "clear, unqualified offer to enter into a

13  contract" when he asked Bibas "We good?" and Bibas accepted that offer by saying "So,

14  we're closed!"  As an initial matter, Zand's question "We good?" was at the end of an

15  email discussing Ion's approval letter, not the term sheet.  The full text of the email is as

16  follows:

17      The final version of letter looks fine, assuming your attachments on budget

18      and production & delivery schedule at the same I sent to you (attached)

19      The only change on letter is i) not that Term Sheet date is July 20th, not the

20      19th and ii) the titles is as current, . . . not definitely, . . . so I deleted "or

21      definitely[symbol]

22      We good?

23

24  foundation, lack personal knowledge, and are irrelevant.  [Doc. # 127.]  Bibas and Kearney have

25  personal knowledge and foundation for their expressions of their *personal beliefs*, and such beliefs may be relevant to whether Bibas and Kearney reasonably relied on any promise made by Ion.  Accordingly,

26  Ion's objections are **OVERRULED**.

27      Nonetheless, the testimony of Bibas and Kearney regarding their *subjective* understanding of the

28  parties' agreement (Supp. Bibas Decl. ¶¶ 4, 8, 10 [Doc. # 107]; Supp. Kearney Decl. ¶¶ 4, 11 [Doc. # 109]), is irrelevant to whether the parties formed a valid, binding contract.

-13-

1  (Zand Decl., Exh. 28.)   More importantly, Atlantique has identified no evidence

2  sufficient to raise a reasonable inference that the parties' mutual understanding changed.

3  Finally, in its motion for partial summary judgment, Atlantique argues that a

4  contract was created when Ion accepted Atlantique's performance, specifically, when (1)

5  Ion insisted that Atlantique provide access to the dailies, (2) "Atlantique refrained from

6  shopping the U.S. distribution rights to other networks, and turned down a specific

7  opportunity to license rights to FOX International Channels," and (3) Ion insisted that

8  "Atlantique consider and/or incorporate ION's numerous creative comments."   (Pl.'s

9  Mot. at 13.)   Atlantique relies on Cal. Civ. Code § 1589, which states "[a] voluntary

10  acceptance of the benefit of a transaction is equivalent to a consent to all the obligations

11  arising from it, so far as the facts are known, or ought to be known, to the person

12  accepting," and Cal. Civ. Code § 3521, which states "[h]e who takes the benefit must

13  bear the burden."

14  With respect to Atlantique's first point, the undisputed facts establish that

15  Atlantique offered to provide Ion access to the dailies *before* the parties' agreement

16  allegedly became binding on July 20, 2012.  (Pl.'s SGD ¶ 73.)  It is also undisputed that

17  Atlantique did not in fact provide Ion access to the dailies until July 20, 2012.  (*Id.* ¶ 76.)

18  Atlantique presents evidence that (1) it intentionally waited to provide Ion access to the

19  dailies until the parties had what Atlantique believed to be a binding agreement, and (2)

20  Ion suspected as much.  (*See* Pl.'s Mot. at 13-14.)  Atlantique does not, however, provide

21  *any* evidence that it *informed Ion* that Ion would not be granted access to the dailies until

22  the parties had a binding agreement.  Ion's mere suspicions that Atlantique was delaying

23  until the parties had a binding agreement (*see* D's SGI ¶ 27 [Doc. # 110]), are not enough

24  to raise a reasonable inference that Ion knowingly accepted the benefit of the parties'

25  agreement or ought to have known that it did so.

26  With respect to Atlantique's second point, Atlantique has not identified any

27  evidence that Ion instructed it to refrain from shopping the Series or made it a

28  precondition of negotiations.  In essence, Atlantique's argument is that Ion accepted the

-14-

benefit of Atlantique's *inaction* by Ion's own failure to act.   The only authority Atlantique cites in support of its argument is *Durgin v. Kaplan*, 68 Cal. 2d 81, 89-92, 65 Cal. Rptr. 158 (1968).  (Pl.'s Mot. at 13-14; Reply at 13.)  The *Durgin* court held that a plaintiff's silent acceptance of stock escrow certificates as part of a settlement during the course of bankruptcy proceedings constituted "an acceptance . . . pursuant to contract law and the intention of the parties to the . . . agreement."  68 Cal. 2d at 90.  Atlantique has cited no case in which a court treated a plaintiff's *inaction* as "the benefit of a transaction," nor has this Court found any.  Indeed, Section 1589's requirement that a defendant knew or ought to have known that he was receiving the benefit of a transaction recommends against such an expansive reading of the Code.  In sum, Atlantique has not identified sufficient evidence to raise a reasonable inference that Ion knowingly accepted the benefit of the parties' agreement or ought to have known that it did so.

    With respect to Atlantique's third point, the parties dispute whether Ion's feedback after July 20, 2012 constituted "meaningful consultation" by Ion pursuant to the term sheet, or merely Ion's expression of its "creative concerns" before signing a binding agreement with Atlantique.  (*Compare* D's Opp'n at 25-26, *with* Pl.'s Reply at 14-15.) Atlantique identifies evidence that (1) Zand raised creative concerns about the Series with Kearney and proposed a group phone call; and (2) McKinnon watched one day of filming of the Series in Paris, gave creative comments, and met with the Series producers and showrunner.  (*See* Pl.'s Mot. at 7; Pl.'s Reply at 14-15; D's SGI ¶¶ 32-33.)  Atlantique has presented no evidence, however, that it informed Ion that it would not engage in meaningful creative consultations until there was a binding agreement between the parties.   Indeed, it is undisputed that Atlantique provided Ion and Ion's creative consultant McKinnon with creative materials, including initial scripts and casting information, months before July 20, 2012.  (Pl.'s SGD ¶ 29.)  Moreover, Atlantique's internal emails suggest that Atlantique realized it was taking a risk when it shared creative materials before a binding agreement was reached.  On July 24, 2012—four days

-15-

1    *after* the date Atlantique claims the agreement became binding—Zimmerman wrote the
2    following email to Kearney and Bibas:

3           Is the deal closed ?????

4           We agreed on all details on Friday, Marc [Zand] confirmed but we don't get
5           a copy for signature!?

6           We have a conference call every day on accent, music, etc and I feel very
7           uncomfortable and will not continue the open communication (access to
8           dailies included) until this is signed and sealed.

9    (Zand Decl., Exh. 43 [Doc. # 96-1 at 11].)

10          Accordingly, the undisputed facts establish that "it [wa]s part of the understanding
11   between the parties in negotiating the terms of their contract that the same be . . . signed
12   by the parties," *Nolte*, 28 Cal. App. 2d at 534.  Absent a signed agreement, the parties did
13   not have a valid, binding contract.  Ion's motion for summary judgment is therefore
14   **GRANTED** as to Atlantique's breach of contract claim.

15   **C.    Atlantique's Promissory Estoppel Claim**

16          Atlantique's second cause of action for promissory estoppel alleges that, "[e]ven if
17   Defendant's conduct was insufficient, under the circumstances to give rise to a binding
18   written contract, Defendant clearly promised to license the Series from Plaintiff on the
19   terms set forth in the Agreement."  (FAC ¶¶ 25-29.)  Ion contends that Atlantique cannot
20   show that (1) Ion made a clear and unambiguous promise, (2) Atlantique reasonably
21   relied on any promise, or (3) Atlantique was injured as a result of its reliance on any
22   promise.  (D.'s Mot. at 20-21.)

23          Under California law, "[t]he elements of a promissory estoppel claim are '(1) a
24   promise clear and unambiguous in its terms; (2) reliance by the party to whom the
25   promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the
26   party asserting the estoppel must be injured by his reliance.'"  *Aceves v. U.S. Bank, N.A.*,
27   192 Cal. App. 4th 218, 226, 120 Cal. Rptr. 3d 507 (2011), quoting *Adv. Choices, Inc. v.*
28   *State Dept. of Health Servs.*, 182 Cal. App. 4th 1661, 1672, 107 Cal. Rptr. 3d 470 (2010).

The Ninth Circuit's analysis of California law in *Rennick v. O.P.T.I.O.N. Care, Inc.* is instructive here.  After holding that as a matter of law the parties had not intended to be bound by their signed "letter of intent," the *Rennick* court considered whether the defendant's alleged promises to the plaintiff should be enforced under the doctrine of promissory estoppel.[7]  77 F.3d at 316.  The Ninth Circuit held that the summary judgment in favor of the defendant on the promissory estoppel claim was appropriate because "[i]f a party refuses to be bound, yet the other changes its position in reliance on the expectation that a contract will be made, reliance on the expectation cannot turn the non-promise into a contract." *Id.* at 317, citing *Phillippe v. Shapell Industries, Inc.*, 43 Cal. 3d 1247, 241 Cal. Rptr. 22 (1987).  The court explained:

> The reason is that reliance must be reasonable to set up an estoppel.  In light
> of the unequivocal nonbinding language in the letter of intent, reliance on
> the existence of a contract was unreasonable as a matter of law.

*Id.* at 317.

Similarly, here, where the parties had mutually agreed that the contract had to be signed in order to be binding, it was unreasonable as a matter of law for Atlantique to rely on the contract before Ion signed it.

Nor has Atlantique identified evidence sufficient to raise a genuine issue of material fact as to whether Ion made a "promise clear and unambiguous in its terms." Atlantique contends that Zand "unambiguous[ly]" promised to be bound by the term sheet because he (1) "referred to the Term Sheet as 'final' on four separate occasions without reserving ION's rights or mentioning a need for any further approvals"; (2) "stated 'we are all good,'"; and (3) "in response to Mr. Bibas [sic] statement 'we're closed!', confirmed that ION 'look[ed] forward to a great collaborative success.'"  These

---

[7] The *Rennick* court also considered whether the defendant's alleged promises should be enforced under the doctrine of part performance, a doctrine that "appear[ed] to be treated" the same as promissory estoppel under California law.  *Id.* at 316.

statements do not constitute an unambiguous promise to perform, any more than they constitute a binding contract, for the reasons discussed at length, *supra*.

Atlantique also asserts that under California law, "if the promisee believes that a promise has been made, and acts in a manner consistent with the promise, then the other party's *silence* is evidence that the promise was clear." (Pl.'s Opp'n at 24 (emphasis in original).) Specifically, Atlantique argues that Zand's failure to "set the record straight" after Bibas said "So we're closed!" constituted silence "sufficient to give rise to summary judgment in *Atlantique's* favor." (*Id.* (emphasis in original).) Atlantique cites no legal authority in support of this argument, and the Court has found none. The only case Atlantique cites is *Garcia v. World Savings, FSB*, 183 Cal. App. 4th 1031, 107 Cal. Rptr. 3d 683 (2010), which is inapposite. In *Garcia*, the trial court held that the lender's statement that it would postpone the sale of the borrowers' home if the borrowers needed additional time to close their loan was conditional, and therefore unenforceable, and granted summary judgment in favor of the lender. *Id.* at 1045. The appellate court reversed, holding that the lender's statement was "sufficiently definite to determine the scope of the [lender's] promise and [the borrowers'] obligation," and, along with the other evidence in the record, was sufficient to create a triable issue as to the borrowers' promissory estoppel claim. *Id.* at 1045-46. Here, in contrast, it is undisputed that the term sheet set forth definite terms upon which the parties agreed—the only issue is whether the term sheet was binding in the absence of Ion's signature.

The California Supreme Court has held that "[s]ilence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance." *Southern California Acoustics Co. v. C. V. Holder, Inc.*, 71 Cal. 2d 719, 722, 79 Cal. Rptr. 319 (1969) (*en banc*). As discussed, *supra*, the parties' previous course of dealing established that the contract would not be binding until it was signed pursuant to the agreed upon protocol.

1   Accordingly, Ion's motion for summary judgment is **GRANTED** as to

2   Atlantique's promissory estoppel claim.

3   **D.   Atlantique's Fraud Claim**

4        Atlantique's fourth cause of action is for fraud.  To state a fraud claim under

5   California law, a plaintiff must allege "(a) misrepresentation (false representation,

6   concealment, or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to

7   defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar*

8   *v. Superior Ct.*, 12 Cal. 4th 631, 638, 49 Cal. Rptr. 2d 377 (1996).

9        Atlantique contends that Ion is liable for fraud because it "concocted a scheme to

10  gain access to the dailies so that it could insist on its creative comments." (Pl.'s Opp'n at

11  28.)  Atlantique's claim relies on the following two inferences:  (1) Ion intentionally

12  misled Atlantique into believing that the parties had a final, binding agreement, when in

13  fact they did not, because (2) Ion knew that Atlantique would only provide Ion with

14  access to the dailies if there was a final, binding agreement.  Ion contends that it (1) did

15  not misrepresent that the deal was closed, and (2) Atlantique offered to show ION the

16  dailies without any precondition.  (D.'s Mot. at 23.)  With respect to the first inference, as

17  discussed, *supra*, Zand's reference to the "final execution copy," his statement "I believe

18  we are all good," his question "We good?," and his failure to contradict Bibas' statement

19  "So we're closed!" did not, as a matter of law, *mislead* Atlantique into believing that the

20  parties had a binding agreement before Ion signed the deal because Atlantique and Ion

21  had agreed about the signature protocol required to make the deal final.

22       Atlantique identifies evidence that on July 19, 2012—*before* Atlantique alleges the

23  deal was closed—Burgess told Nalle to change the subject if Atlantique asked him

24  whether there were "any other hurdles to signature."  (Barchie Decl., Exh. V [Doc. # 142-

25  3].)   Nalle emailed Zimmerman, told him to email Zand, and said that Zand was

26  "impatient with how long the process is taking" and "[w]e would all like to see dailies."

27  (Zand Decl., Exh. 91.)  While this evidence could support a reasonable inference that Ion

28  misled Atlantique regarding *how close the parties were to signing a final, binding*

1  *contract*, this evidence does not raise a *reasonable* inference that *after* July 20, 2012, Ion
2  represented to Atlantique that the parties had a final, binding agreement when in fact they
3  did not.

4      The only evidence Atlantique identifies of Ion's conduct after July 20, 2012 is an
5  email internal to Ion in which Burgess described Ion's "business affairs position" with
6  Atlantique as "a passive hold." (Supp. Barchie Decl., Exh. EEE [Doc. # 143-10].) This
7  evidence is insufficient to raise a reasonable inference of misrepresentation as it does not
8  involve a statement or omission in a statement *to Atlantique*.

9      Accordingly, Ion's motion for summary judgment is **GRANTED** as to
10  Atlantique's fraud claim.

11  **E.**    **Atlantique's Unjust Enrichment Claim**

12      Atlantique's third cause of action is for unjust enrichment. As Ion points out,
13  California courts have repeatedly held that "unjust enrichment" is not an independent
14  cause of action under California law. *See, e.g.*, *Melchior v. New Line Prods., Inc.*, 106
15  Cal. App. 4th 779, 793, 131 Cal. Rptr. 2d 347 (2003) ("there is no cause of action in
16  California for unjust enrichment" because "[t]he phrase 'Unjust Enrichment' does not
17  describe a theory of recovery, but an effect: the result of a failure to make restitution
18  under circumstances where it is equitable to do so" (internal quotations omitted)); *Perdue
19  v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 922, 216 Cal. Rptr. 345 (1985) (unjust enrichment
20  "depends upon a finding pursuant to some other cause of action" that charges were
21  invalid or excessive). Atlantique has identified no California case supporting its apparent
22  contention that a cause of action for unjust enrichment is available under California law.
23  (*See* Pl.'s Opp'n at 27).

24      As unjust enrichment depends upon a finding of liability pursuant to some other
25  cause of action, and Atlantique has no remaining viable cause of action, Ion's motion for
26  summary judgment is **GRANTED** as to Atlantique's unjust enrichment claim.

27
28

**F.      Atlantique's Motion for Partial Summary Judgment**

For the same reasons that Ion is entitled to summary judgment, Atlantique is not. Viewing the evidence in the light most favorable *to Ion* does not change the result. Accordingly, Atlantique's motion for partial summary judgment is **DENIED**.

**IV.**

**CONCLUSION**

In light of the foregoing, Ion's motion for summary judgment is **GRANTED** in its entirety, and Atlantique's motion for partial summary judgment is **DENIED**.

**IT IS SO ORDERED.**

DATED:  January 31, 2014

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE